# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE | * | **BANKR. NO. 19-11528** |
| | * | |
| **CELLA III, LLC,** | * | **CHAPTER 11** |
| | * | |
| DEBTOR. | * | **SECTION "A"** |
| | * | |

**************************************   *************************************

| | | |
|---|---|---|
| **CELLA III, LLC,** | * | |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| **V.** | * | **ADVERSARY NO. 19-01145** |
| | * | |
| **JEFFERSON PARISH HOSPITAL** | * | |
| **DISTRICT #2, PARISH OF JEFFERSON,** | * | |
| **STATE OF LOUISIANA D/B/A/ EAST** | * | |
| **JEFFERSON GENERAL HOSPITAL,** | * | |
| | * | |
| DEFENDANT. | * | |

## MEMORANDUM OPINION

This Court conducted a three-day trial on September 18, 21, and 22, 2020, to resolve the claims asserted in the *Petition for Declaratory Judgment, Breach of Contract of Lease, and Damages* (the "Petition"), [ECF Doc. 1-1], filed in the above-captioned adversary.  At the close of the trial, the Court took the matter under submission.  The Court now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[1]

---

[1]    These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.  To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law.  To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

## RELEVANT PROCEDURAL BACKGROUND

Prepetition, the plaintiff, Cella III, LLC ("Cella") filed the Petition against the defendant, Jefferson Parish Hospital District #2, Parish of Jefferson, State of Louisiana d/b/a East Jefferson General Hospital ("EJGH") in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana (the "State Court"), on September 12, 2018.  In its Petition, Cella asserts a claim for breach of a May 2016 lease between Cella and EJGH (the "Lease") and seeks declaratory judgments that, pursuant to the Lease and extrinsic evidence, (i) EJGH is required to building a "Free-Standing Emergency Department" or pay Cella damages in "an amount to have someone else build-out the building as a Free-Standing Emergency Room in accordance with the plan submitted by EJGH"; and (ii) EJGH has breached the Lease, failed to cure the breach timely, and, therefore, the Lease has terminated and Cella may collect "accelerated rent, cost[s], and attorney fees."

Shortly after filing for bankruptcy relief in this Court on June 5, 2019, Cella removed the State Court case to the U.S. District Court for the Eastern District of Louisiana (the "District Court") pursuant to 28 U.S.C. §§ 1334(b), 1446(a), and 1452, as well as Federal Rule of Bankruptcy Procedure 9027.  The District Court referred the case to this Court, [No. 19-11743, ECF Doc. 18 (E.D. La. Oct. 22, 2019)], where it was allotted to Judge Jerry Brown.

## JURISDICTION AND VENUE

Congress conferred authority to bankruptcy judges through two sections of title 28 of the United States Code:  (i) § 1334, which grants subject-matter jurisdiction to district court for "all civil proceedings arising under title 11, or arising in or related to cases under title 11," 28 U.S.C. § 1334(b); and (ii) § 157, which allows district courts to transfer cases under title 11 or related-to cases under title 11 to bankruptcy courts, 28 U.S.C. § 157(a).  A proceeding which arises under or

arises in a case under title 11 is a "core" proceeding. 28 U.S.C. § 157(b); *see also Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987) ("[T]he phrases 'arising under' and 'arising in' are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt."). Section 157 provides a nonexclusive list of matters considered to be "core." *See* 28 U.S.C. § 157(b)(2). But a matter is considered to be "non-core" if it is merely "related to" a case under title 11. *See* 28 U.S.C. § 157(c)(1).

"Congress gave bankruptcy courts the power to 'hear and determine' core proceedings and to 'enter appropriate orders and judgment,' subject to appellate review by the district court." *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015); *see also* 28 U.S.C. § 157(b)(1). "But it gave bankruptcy courts more limited authority in non-core proceedings: They may 'hear and determine' such proceedings, and 'enter appropriate orders and judgments,' only 'with the consent of all parties to the proceeding.'" *Wellness Int'l Network, Ltd.*, 135 S. Ct. at 1940; *see also* 28 U.S.C. § 157(c)(2). "Absent consent, bankruptcy courts in non-core proceedings may only 'submit proposed findings of fact and conclusions of law,' which the district courts review *de novo*." *Wellness Int'l Network, Ltd.*, 135 S. Ct. at 1940; *see also* 28 U.S.C. § 157(c)(1).

Consent to a bankruptcy court's authority to render a final judgment in a matter can be express or implied. Indeed, "[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express[;] [n]or does the relevant statute, 28 U.S.C. § 157, mandate express consent." *Wellness Int'l Network, Ltd.*, 135 S. Ct. at 1947. "Applied in the bankruptcy context,

[the implied-consent standard] possesses . . . pragmatic values—increasing judicial efficiency and checking gamesmanship . . . ." *Id*. at 1948.

When Cella removed the State Court case to the District Court, it notified this Court and EJGH that it consented to the entry of final orders or judgment by this Court as required by Federal Rule of Bankruptcy Procedure 9027(a)(1). [ECF Doc. 9]. Rule 9027 also requires:

> Any party who has filed a pleading in connection with the removed claim or cause of action, other than the party filing the notice of removal, shall file a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy court. A statement required by this paragraph shall be signed pursuant to Rule 9011 and shall be filed not later than 14 days after the filing of the notice of removal. Any party who files a statement pursuant to this paragraph shall mail a copy to every other party to the removed claim or cause of action.

FED. R. BANKR. P. 9027(e)(3). EJGH filed no such statement into the record.

On November 18, 2019, Judge Brown issued a Scheduling Order with pretrial and trial dates to which "[c]ounsel for the parties have agreed." [ECF Doc. 12]. The Order contained no statement regarding EJGH's lack of consent to Judge Brown's ability to enter final orders or judgment in resolving the claims contained in the Petition. The Scheduling Order was amended on January 13, 2020, and again on March 31, 2020, at the request of the parties; neither of those Orders contained a statement regarding EJGH's lack of consent to Judge Brown's ability to enter final orders or judgment in this action. [ECF Docs. 21 & 41].

On April 24, 2020, EJGH requested Judge Brown to enter final judgment in not one, but three motions for summary judgment or partial summary judgment. [ECF Docs. 47, 48 & 49]. On April 30, 2020, EJGH filed a fourth motion for summary judgment, asking Judge Brown to enter final judgment in its favor. [ECF Doc. 57]. On May 21, 2020, Judge Brown denied each of EJGH's motions for summary judgment or partial summary judgment. [ECF Doc. 69].

4

Cella's bankruptcy case and this adversary proceeding were reassigned to the undersigned on July 16, 2020, in anticipation of Judge Brown's retirement.  This Court held a status conference on July 30, 2020, where, for the first time, EJGH notified this Court and Cella that it did not consent to this Court entering final orders or judgment in this action.  And at the start of the three-day trial on the claims listed in the Petition, EJGH again announced that it did not consent to this Court's jurisdiction to render final judgment in this matter and asserted that this Court is limited to making proposed findings of fact and conclusions of law for review by the District Court.  *See* Hr'g Tr. 20:16–21:1 (Sept. 18, 2020) [ECF Doc. 163].

This Court finds, however, that EJGH impliedly consented to this Court's jurisdiction to enter final judgment in this action when it requested Judge Brown to enter final judgment on four motions for summary judgment.  *See, e.g., Haley v. Barclays Bank Del. (In re Carter)*, 506 B.R. 83, 88 (Bankr. D. Ariz. 2014).  EJGH did not file a Rule 9011 statement within fourteen days of the removal of the case pursuant to Rule 9027.  By its multiple motions for summary judgment, it specifically asked this Court to enter final judgment in its favor.  But then at trial—with a new judge—EJGH objected to the constitutional authority of this Court to enter a final judgment under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), and its progeny.  As explained by the court in *In re Carter*:

> One of the underlying reasons for the doctrine of waiver or forfeiture by litigation conduct is to prevent litigation conduct that would be described as sandbagging, "heads I win; tails you lose," or second bite at the apple strategy.  If a *Stern* objection were not deemed waived by the party making it seeking summary judgment, then the party could seek or permit a substantive ruling by the Bankruptcy Court, and then waive that objection if the ruling is favorable but insist on it if unfavorable, and get a second bite at the apple.  To avoid the possibility of that kind of litigation conduct by virtually any defendant in a bankruptcy adversary proceeding or contested matter, the Court must conclude that [*Executive Benefits Ins. Agency v. Arkison*, 133 S. Ct. 2880 (2013)] necessarily implies that a *Stern*

5

objection is waived or forfeited whenever the party making it requests a substantive ruling from the Bankruptcy Court.

506 B.R. at 88 (citations omitted).

EJGH has been represented by its State Court litigation counsel as well as bankruptcy counsel in the adversary proceeding before this Court. Cella made its Rule 9011 election timely. EJGH did not choose to do the same as required by the Bankruptcy Rules. This Court finds that EJGH was "made aware of the need for consent and the right to refuse it, and still voluntarily appears to try the case before the [bankruptcy court]." *Wellness Int'l Network, Ltd.*, 135 S. Ct. at 1948. Based on EJGH's conduct in this proceeding, the Court concludes that EJGH impliedly consented to the entry of a final judgment by this Court. *See id.*; *Frontseat, LLC v. Stern*, No. 18-CV-2208, 2020 WL 2933442, at *1–2 (E.D.N.Y. May 31, 2020); *Herrera-Edwards v. Moore (In re Herrera-Edwards)*, 578 B.R. 853, 860–61 (Bankr. M.D. Fla. 2017); *Conti v. Perdue Bioenergy, LLC (In re Clean Burn Fuels, LLC)*, 540 B.R. 195, 199 n.2 (Bankr. M.D.N.C. 2015).

Therefore, this Court has jurisdiction to grant the relief provided for herein on a final basis pursuant to 28 U.S.C. §§ 1334 and 157(c)(2). The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

## FINDINGS OF FACT

### A.  Cella's Business and Capital Structure

Cella is a Louisiana limited liability company with a sole member, George Cella. *See* Hr'g Tr. 63:12–22 (Sept. 18, 2020). Cella owns property located at 4545 Veterans Boulevard in Metairie, Louisiana, on which sit three buildings. *See* Hr'g Tr. 67:8–19 (Sept. 18, 2020). One building houses a Hertz car rental business, one building houses a Smoothie King franchise, and the last building historically housed a bank in part of the building, while Cella continues to operate

a mini storage and vault business in another part of that building. *See* Hr'g Tr. 67:8–68–12 (Sept. 18, 2020).

**B. The Lease**

As of May 12, 2016, the date on which Cella and EJGH executed the Lease, the portion of 4545 Veterans Memorial Blvd that formerly housed a bank and includes certain parking spaces and common areas (the "Leased Premises") had been vacant for approximately one year. *See* Hr'g Tr. 68:25–69:14 (Sept. 20, 2020). Under a section of the Lease entitled "Permitted Use," Cella "agree[d]" to EJGH's "use of the leased premises for operation of a 'Community Medical Center', defined as the provision of healthcare related services." Lease, § 10.[2]

The Lease requires EJGH to pay base monthly rent plus common area maintenance ("CAM") charges. *See* Lease, §§ 4 & 5. The monthly rent for the first five years of the Lease is estimated in the Lease to be $32,812.50 per month (or $37.50 per square foot per 10,500 square feet / 12 months) and the Lease estimates the CAM charges to be $6,125 per month ($7.00 per square foot per 10,500 square feet / 12 months).[3] The base rent would increase by 10% starting in Year 6 of the Lease. *See* Lease, § 4. The Lease also requires EJGH to maintain its own insurance covering commercial general liability, property damage, worker's compensation, flood hazard, and business interruption, and, with the exception of worker's compensation insurance, naming Cella as an additional insured. *See* Lease, § 13.

The Lease states that "[t]he term of this Lease shall be for an initial period of one hundred twenty (120) months, commencing on the lease Commencement Date, ("Commencement Date"),

---

[2]      The parties introduced the Lease into evidence as "Joint Exhibit 1."

[3]      The parties stipulated at trial that the actual monthly rent and CAM charges totaled $43,499.82. [ECF Doc. 154].

and ending at midnight on the day before the tenth (10th) anniversary of the Commencement Date."

Lease, § 2(A). Section 3 of the Lease defines the "Commencement Date" as "the earlier to occur

of two hundred forty (240) days following Lease execution or receipt of license to operate as a

'community emergency center' (CEC) by the licensing bodies." Lease, § 3. That section adds:

> No Base Rent, pro-rata common area maintenance, property tax and property insurance payments shall be due from Lessee for Months 1 through 8 after lease execution for the Leased Premises during the period between the Lease Execution and the Commencement Date, but such shall be required beginning in Month 9 and thereafter.

*Id.*

The Lease refers to that initial period of 120 months referenced in section 2(A) of the Lease

as the "Initial Term." *Id.* EJGH (or any successor in interest)[4] has the right to terminate the Lease

at the expiration of the fifth year of the Lease, provided that it gives Cella written notice at least

180 days prior to the expiration of the fifth year of the Lease. *See* Lease, § 2(B). If that option is

chosen, "all Base Rents due and payable pursuant to terms of the lease for the next thirty (30)

months of the initial term shall immediately become due, as well as all unamortized commission

(25%) and improvement allowance costs (25%)." *Id.* But EJGH also has options to renew the

lease for three additional periods of 60 months, called "Renewal Term(s)," provided that (a) written

notice of that election is given at least 180 days prior to the expiration of the Initial Term or in-

force Renewal Term, (b) the "Lease is and remains in effect through its Initial Term and/or any in-

---

[4]       At the time of trial, LCMC Health, a New Orleans-based, non-profit health system, was in the process of acquiring EJGH. *See* Hr'g Tr. 34:20–22 (Sept. 18, 2020) ("There's no question that East Jefferson is selling this Lease to LCMC." (statement of counsel for Cella)); Hr'g Tr. 421:19–22 (Sept. 21, 2020) ("[W]ith the subject of East Jefferson, the voters just approved a sale to LCMC . . . .") (statement of counsel for EJGH)). That acquisition was finalized as of October 1, 2020, and knowledge of that closing is in the public domain. *See LCMC Health's Acquisition of East Jefferson General Hospital Finalized*, LCMC HEALTH BLOG (Oct. 1, 2020), http://www.lcmchealth.org/blog/2020/lcmc-healths-acquisition-of-east-jefferson-gener/.

force Renewal Term," and (c) "if Lessee is not in default of the covenants, conditions and terms contained in this Lease and any and all amendments hereto at the time of such exercise."  Lease, § 2(C).  Should EJGH elect to renew the Lease after the Initial Term, the Base Rent would increase in steps per the schedule identified in the Lease.  *Id.*

Under "General Lessee Responsibilities," the Lease gives EJGH, as of the Commencement Date, the responsibility

> for operation and maintenance of the Leased Premises, including payment of all agreed-upon expenses related to said operation and maintenance.  The operating maintenance expenses for which Lessee is obligated shall include, but not be limited to, Real Estate Taxes, Insurance, Utilities and Exterior and Interior Maintenance of the Leased Premises, except for those responsibilities outlined in Section 9 following.

Lease, § 8.[5]  That section also gives EJGH, as of the Lease Execution Date, "full and unlimited access and use of the Premises for build-out/construction."  *Id.*

The Lease defines the "obligations and rights" of the parties concerning improvements and alterations to the Leased Premises.  Among other things, Cella as the Lessor would provide

> a Lessee Improvement Allowance in the amount of $18.00 per rentable square foot, such being payable upon completion of all tenant improvements or through rent abatement, at Lessor's option; if the rent abatement option is chosen, such beginning with Month 9, fully abating each month's rent until the Allowance is fully depleted.

Lease, § 7(A)(1).  EJGH's "obligations and rights" include:

> (1)     All of Lessee's Improvements, shall be constructed in a good and workmanlike manner, in accordance with law, by a bonded or insured contractor, chosen by Lessee; Lessee shall have the right to use reputable contractors, subcontractors, architects and engineers of the Lessee's selection for the design and construction of any and all Lessee improvements and to competitively bid all work.

---

[5]     Section 9 of the Lease provides that Cella's "responsibilities shall be limited to maintaining the structural integrity of the roof, external walls, floor, floor slab, foundation and other structural elements of the Building."  Lease, § 9.

Proof of payment of performance bonds and insurance shall be provided to Lessor prior to commencement of any work.  Prior to the commencement of construction or demolition of any existing improvements, Lessee, or sub-lessee, shall furnish to Lessor a complete set of plans and specifications of the improvements proposed by Lessee for Lessor's review and approval.  All areas of design and engineering must be certified by and conducted under the direct supervision of architects and engineers license and registered in the State of Louisiana.

Lessee agrees that any changes to the exterior building shall be in conformity with the architectural harmony with the existing architecture and with the architectural integrity of the existing construction and shall not change the design or appearance of the exterior of the premises without the specific consent of the Lessor.

Lease, § 7(B)(1).  The Lease further states:

(3)     Lessee shall have the right to put its name on both sides of the project's pylon/monument signs at no cost to lessor.  Lessee also shall have the right to place signage on the front and both sides of the building.  Lessee shall have the right to install any signage required by and Federal or State Regulatory agency in association with their use.

A medical sign shall be provided at the entry from the public road(s) serving the site.  The Medical sign at the entry to the side shall be illuminated and connected to the emergency essential electrical system.

Lessee, at Lessee's cost, shall have the right to install an LED sign on the premises.

Any sign to be located on the front, sides or top of the Building, or the sign pylon, by Lessee, shall be subject to Lessor's prior approval which shall not be unreasonably withheld.  However, all signage must be in accordance with all Parish ordinances and may not diminish the size or location of Lessor's or any present signage located on the building or lighted sign pylon.

(4)     Lessee may renovate the exterior of the Building/Façade at Lessee's expense for branding and marketing purposes; Lessor approval of the renovation plan, which will not be unreasonably withheld, is required.

Lease, § 7(B)(3)–(4).  The language of the Lease also provides that EJGH "shall have the right to construct two (2) canopies for patient drop off, and ambulance cover as regulated by Federal and State Agencies," and describes those canopies.  Lease, § 7(B)(6).

10

According to the Lease, as the Lessee, EJGH,

> at its sole cost and expense, will perform all maintenance, repairs, renovation and replacements necessary or desirable to keep the Office Space and all associated Improvements in good order, repair, condition and appearance at all times, and shall, at its own expense, repair, clean, and renovate the said Leased Premises and associated improvements, as may be necessary.

Lease, § 11(A).

The Lease includes a list of events of default by EJGH, which included:  "(i) if Lessee fails to pay any installment of Monthly Rent on the date on which it is due and if that failure continues for thirty (30) calendar days after written notice by Lessor to Lessee of that failure" and "(ii) if Lessee violates or fails to comply with any of the other covenants, conditions, or agreements contained in this Lease, and if such violation or failure continues for more than thirty (30) calendar days after written notice by Lessor to Lessee of such violation or failure."  Lease, § 20.  The Lease also identifies the remedies to which Cella may be entitled upon EJGH's breach of the Lease:

> Upon the occurrence of any one or more of the aforesaid events of default by Lessee, Lessor shall have the options, without further notice or putting in default, such notice being hereby waived, of invoking any or all of the following rights or remedies:  (i) proceeding for all past due Rent, damages, costs and reasonable attorneys' fees caused by such default; or (ii) proceeding for all past due Rent, damages, costs and reasonable attorneys' fees cause by such default and canceling and terminating this Lease, which cancellation shall be effective immediately, without putting Lessee in default, Lessee hereby assenting thereto and expressly waiving the legal notice to vacate as required in Article 4701 of the Louisiana Code of Civil Procedure.  Notwithstanding the cancellation and terminating of this Lease, Lessor shall also be entitled to recover the additional damages as set forth in Section 21(B) below.

Lease, § 21(A).  Section 21(B) identifies those "additional damages" that Cella is entitled to recover in the event EJGH breaches the Lease and Cella terminates the Lease:

> If Lessor elects option (ii) [in section 21(A) of the Lease] and terminates this Lease, then Lessor shall use its best efforts to re-lease the Leased Premises for such price on such terms as may be reasonable and immediately obtainable and Lessee shall be and remain liable, not only for Rent due and other obligations

11

incurred up to the date of termination, but also for stipulated or liquidated damages for its nonperformance which shall be equal to the amount by which the total amount of all Monthly Rent and other charges that Lessor was to have received under this Lease from the date of termination to the original expiration date of the Initial Term or if Lessee has exercised the Option to Renew, the Renewal Term then in effect, exceeds the total amount of rental payments by the new tenant during such period along with reasonable attorney's fees, costs and expenses.

Lease, § 21(B).  Further, the Lease provides a general default provision applying to both Cella and EJGH that states:

If either party is in default in the performance of any of the terms, covenants, agreements, or conditions contained in this Lease and the non-defaulting party places the enforcement of this Lease, or any party thereof, in the hands of an attorney the defaulting party in such dispute agrees to pay, on demand, all reasonable attorney's fees and other expenses or fees incurred by the prevailing party in connection with such actions.

Lease, § 24.

The Lease also contains a merger clause as well as a choice-of-law provision, requiring the Lease to be "governed and interpreted solely by the laws of the State of Louisiana."  Lease, § 32(A) & (C).

## CONCLUSIONS OF LAW

### A.    Choice of Law

When resolving state law claims that do not implicate federal policy, bankruptcy courts apply the choice-of-law rules of the forum in which they sit.  *See ASARCO LLC v. Americas Mining Corp*., 382 B.R. 49, 60–61 (S.D. Tex. 2007) (citations omitted).  Therefore, this Court applies Louisiana's choice-of-law rules found in the Louisiana Civil Code.

Article 3537 of the Louisiana Civil Code provides the general choice-of-law rule in the absence of a contractual choice-of-law clause:  "Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most

12

seriously impaired if its law were not applied to that issue." Article 3540 of the Louisiana Civil Code governing "Party autonomy" supplies choice-of-law doctrine when parties have agreed to a choice-of-law rule: "All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537."

The Lease states that it "shall be governed and interpreted solely by the laws of the State of Louisiana." Lease, § 32(C). Because the parties have agreed to apply Louisiana law to construe the Lease, this Court will apply Louisiana law unless doing so would seriously impair the public policy of the state whose law would otherwise be applicable under article 3537. The Court concludes that, even in the absence of a choice-of-law provision, Louisiana law would be applicable here under article 3537. Pursuant to article 3537, applicable state law

> is determined by evaluating the strength and pertinence of the relevant policies of the involved states in light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

> La. Civ. Code. art. 3537.[6]

---

[6]     Article 3515 provides that applicable state law

> is determined by evaluating the strength and pertinence of the relevant policies of all involved states in light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La. Civ. Code. art. 3515.

The relevant facts in this case point toward the application of Louisiana law.  Both parties are domiciled in Louisiana, *see* Petition, ¶¶ 1–2, and the object of the Lease is located in Louisiana. Under articles 3515 and 3537, Louisiana's policies would be most seriously impaired if its law were not followed.  Further, the parties contractually agreed that Louisiana law would apply to disputes arising under the Lease, and Louisiana law honors such choice-of-law provisions.  *See Delhomme Indus., Inc. v. Houston Beechcraft, Inc*, 669 F.2d 1049, 1058 (5th Cir. 1982) (citation omitted).

### B.    Legal Standards for Contractual Interpretation

"Agreements legally entered into have the effect of laws on those who have formed them." *McCrary v. Park S. Props*., 560 So.2d 38, 45 (La. App. 2 Cir. 1990).  "It is not the province of the court to relieve the party of a bad bargain, no matter how harsh."  *Id*.  Rather, "courts are bound to give legal effect to all contracts according to the true intent of the parties and the intent is to be determined by the words of the contract when these are clear and explicit and lead to no absurd consequences."  *Id*.  Indeed, "[a] court's overriding question when interpreting a contract is determining the parties' intent to give effect to their intentions."  *Northstar Offshore Group, LLC v. A&B Valve & Piping Sys., LLC (In re Northstar Offshore Grp., LLC)*, No. 17-03406, 2018 WL 5880949, at *5 (Bankr. S.D. Tex. Nov. 5, 2018) (citing *Reliant Energy Servs., Inc. v. Enron Can. Corp*., 349 F.3d 816, 822 (5th Cir. 2003)).

"To determine intent, [courts] look to the plain language of the contract, its commercial context, and its purposes."  *Reliant Energy Servs., Inc*., 349 F.3d at 822 (citing *Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981)).  Contract interpretation begins by looking to the "four corners" of the contract, followed by consideration of extrinsic evidence only if the contract is ambiguous.  *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006); *see also Reliant Energy*

*Servs., Inc.,* 349 F.3d at 822 ("When a contract is expressed in unambiguous language, its terms will be given their plain meaning and will be enforced as written." (citation omitted)).  Indeed, "[w]hen the words of a contract are clear and unambiguous and lead to no absurd consequences, the Court will discern the contract's meaning and the parties['] intent within the four corners of the document." *Pellerin Constr., Inc. v. Witco Corp.*, 169 F. Supp. 2d 568, 578 (E.D. La. 2001) (citing LA. CIV. CODE arts. 1848 & 2046).

A contract "is ambiguous when it is reasonably susceptible to more than one meaning, in light of surrounding circumstances and established rules of construction." *Dean*, 438 F.3d at 460–61 (quoting *N. Shore Lab. Corp. v. Cohen*, 721 F.2d 514, 519 (5th Cir. 1983)).  "The mere fact that the parties may disagree on the meaning of a contractual provision is not enough to constitute ambiguity." *Reliant Energy Servs., Inc.*, 349 F.3d at 822.  And "a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Transnational Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000); *see also New Orleans Jazz & Heritage Found., Inc. v. Kirksey*, 40 So.3d 394, 400 (La. App. 4 Cir. 2010) ("[E]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." (citing LA. CIV. CODE art. 2050)).

### C.   Legal Standards for Breach of Contract and Damages

Under Louisiana law, "[t]he essential elements of a breach of contract claim are the existence of a contract, the party's breach thereof, and resulting damages." *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 165 So.3d 1211, 1216 (La. App. 4 Cir. 2015) (citation omitted); *see also Bellwether Enter. Real Estate Capital v. Jaye*, Nos. 19-10351 & 19-13058, 2020 WL

3076661, at *9 (E.D. La. June 10, 2020).  "The party claiming the rights under the contract bears the burden of proof."  *1100 S. Jefferson Davis Parkway, LLC*, 165 So.2d at 1216 (citation omitted).

"An obligor is liable for the damages caused by his failure to perform a conventional obligation."  LA. CIV. CODE art. 1994.  "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived," LA. CIV. CODE art. 1995, and "[t]he party bringing suit has the burden of proving any damage suffered by it as a result of a breach of contract," *Payphone Connection Plus, Inc. v. Wagners Chef, LLC*, 276 So3d 589, 597 (La. App. 4 Cir. 2019) (internal quotations and citation omitted).  Indeed, "[a] court is not justified in fixing damages in the absence of definite proof."  *Jackson v. Lare*, 779 So.2d 808, 814 (La. App. 2 Cir. 2000).

Louisiana law permits parties to "stipulate the damages to be recovered in case of nonperformance, defective performance, or delay in performance of an obligation."  LA. CIV. CODE art. 2005.  That general rule is subject to an exception allowing judicial modification of a stipulated damages provision if it is "so manifestly unreasonable as to be contrary to public policy."  LA. CIV. CODE art. 2012.  When enforcing stipulated damages provisions under Louisiana law, courts should consider three principles:  (1) "the aim of a stipulated damages provision is to fix the measure of damages in advance and to constrain the timely performance of the principal obligation"; (2) "stipulated damages should reasonably approximate the obligee's loss in the event of a breach"; and (3) "the stipulated amount is presumed reasonable, and the party that says otherwise must rebut the presumption."  *Bellwether Enter. Real Estate Capital*, 2020 WL 3076661, at *6–7 (internal quotations and citations omitted).

16

### D. EJGH's Failure to Date To Develop a Community Medical Center on the Leased Premises Does Not Constitute a Breach of the Lease

In Count One, Cella asks this Court to interpret the terms of the Lease and consider other extrinsic evidence to (i) declare that EJGH is required "to build-out a Free-Standing Emergency Department and no other type of 'Community Medical Center'" and (ii) require EJGH to complete the construction of that Free-Standing Emergency Department or pay Cella damages in "an amount to have someone else build-out the building as a Free-Standing Emergency Room." Petition, at 14. In Count Two, Cella likewise asks for a declaration based on the Lease and extrinsic evidence that (i) EJGH breached the Lease and, therefore, (ii) the Lease is terminated and Cella may obtain damages under section 21(A)(ii) of the Lease. *See* Petition, at 15. Finally, in Count Three, Cella asserts a breach-of-contract claim for failure to respond timely to demand letters sent by Cella and to cure the alleged breaches of the Lease. To the extent that each of those claims is dependent upon EJGH having the obligation under the Lease to improve the property and build specifically a community medical center, the Court finds that, at this time, no breach has occurred.

Pursuant to Louisiana's rules of statutory construction, this Court's determination of the obligations owed by EJGH begins with the "four corners" of the Lease, followed by consideration of extrinsic evidence *only* if the Lease is ambiguous. *See Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006); *see also Reliant Energy Servs., Inc. v. Enron Can. Corp.,* 349 F.3d 816, 822 (5th Cir. 2003). Here, the Court finds that the intent of the parties regarding their obligations under the Lease can be ascertained by a careful reading of each unambiguous provision and the Lease as a whole. Therefore, the Court examines only the plain terms of the Lease and cannot resort to examination of any extrinsic evidence.

17

A reading of the Lease as a whole plainly indicates the parties' intention that EJGH would have the right to make Cella-approved improvements to the Leased Premises at its own cost, and the right to operate on the Leased Premises a "'Community Medical Center', defined as the provision of healthcare related services." Lease, §§ 7–8 & 10–11. The Lease provided that Cella would give EJGH an "improvement allowance" in the form of rent abatement for the first eight months after the Lease was signed by the parties. *See* Lease, §§ 3 &7(A)(1). And at the end of the Lease, any improvements made to the Leased Premises not affixed to the realty would become Cella's property without any compensation to EJGH. *See* Lease, § 7(A)(4).

But like the lease considered in *McCrary v. Park South Properties*, "[t]he language of these portions of the lease appear to place no time limits on lessee['s] obligation and/or right to develop the property and no such limits are contained elsewhere in the lease." 560 So.2d 38, 48 (La. App. 2 Cir. 1990). And like the parties in *McCrary*, the parties here are sophisticated commercial parties who included a merger clause in the Lease. *See* Lease, § 32(A). "Thus, had the parties intended to impose a timetable for the development of the property such a requirement would have been expressly stated in the lease." *McCrary*, 560 So.2d at 48. Indeed, the plain terms of the Lease indicate that parties anticipated that the construction of a "Community Medical Center" was not a guaranteed endeavor, as it was dependent upon obtaining licensing and permitting from third parties:

SECTION 28:  CONTINGENCIES

Execution of the Lease Agreement shall be contingent upon the receipt of a Zoning Certification Letter from the Parish of Jefferson Zoning Administrator certifying  or confirming that the operation of a "Community Medical Center", 24 hours per day and 7 days per week, at this location is an allowed/permitted use.

Lease will be contingent and conditioned upon the issuance of required licensing by the Louisiana Department of Health and Human Services and all other

18

governmental agencies, including the Fire and Sanitary Departments, having
jurisdiction thereof, which authorizes the access, use and occupancy of the Leased
Premises for all Permitted Uses (as defined above). . . .

Lease, § 28.  That section also allowed EJGH the option of terminating the Lease before Day 45

of the Lease, forfeiting only the first month's rent and CAM charges, if those approvals were not

obtained within 45 days of the execution of the Lease.  *Id.*

In this case, however, the Lease became effective with or without EJGH obtaining

regulatory approval to operate a community emergency center on the Leased Premises.[7]  Even

though the regulatory approvals were not obtained within the 45-day inspection period, EJGH did

not choose to exercise its exclusive option to terminate the Lease.  Further, the definition of the

"Commencement Date" of the Lease left room for the possibility that those required licenses and

permits would not be obtained within the first 240 days of the execution of the Lease—or at all—

---

[7]      Contrast this case and the *McCrary* case with *Crescent City Liquidation Trust v. Mirage Resorts,
Inc.*, No. 01-899, 2002 WL 1046709 (E.D. La. May 20, 2002).  There, Mirage Resorts, Inc. ("Mirage")
entered into a contract to purchase a riverboat casino from a debtor in bankruptcy proceedings, contingent
upon Mirage obtaining regulatory approval for the transfer of the casino's operating license and the transfer
of the berthing site from New Orleans by the parties' contractual "drop-dead" date of January 24, 1996.  *Id.*
at *3–6.  When the appropriate regulatory agency failed to approve the transfer of the berthing site by the
closing date, Mirage terminated the contract.  *Id.* at *4.  The debtor filed suit a year later, alleging that
Mirage had breached the contract because (i) the closing deadline was not a material, "suspensive"
condition of the agreement; and (ii) Mirage's dilatory efforts in securing the various regulatory approvals
demonstrated a lack of good faith to proceed to closing.  *Id.*  In affirming the bankruptcy court's finding
that Mirage had not breached the contract, the district court held that "[t]he clear language of the [contract
as amended] demonstrates that the closing of Mirage's purchase was conditioned unequivocally upon
obtaining regulatory approval for the transfer of [the debtor's] license and the transfer of the berthing site
from New Orleans by January 24, 1996."  *Id.* at 6.  When the required regulatory approvals were not
obtained timely, the contract failed to become effective; therefore, no breach could have occurred.  *Id.*  The
district court also affirmed the bankruptcy court's finding that the debtor had not met its burden to show
Mirage's bad faith or dilatory practices that affected the timing of regulatory approval.  *Id.*
        The parties here did not include a "drop-dead" date by which EJGH was obligated to obtain
regulatory approvals to operate as a community emergency medical center on the Leased Premises.  Indeed,
neither party here argues that obtaining regulatory approvals constituted a suspensive condition to be met
before the contract became effective, suggesting that the primary "cause" for the Lease, at least on Cella's
part, was the collection of rent for the Leased Premises.

which is why the Lease would commence—and EJGH would start paying rent—on "the earlier to occur of two hundred forty (240) days following Lease execution **or** receipt of license to operate as a 'community emergency center' (CEC) by the licensing bodies."  Lease, § 3 (emphasis added). Indeed, EJGH's monthly rental obligation to Cella during the life of the Lease was not affected by whether or not any improvements to the Leased Premises were made by EJGH.

Under the Lease, EJGH is obligated to pay monthly base rent and CAM charges, starting in month 9 of the Lease.  *See* Lease, §§ 3–5 & 7(A)(1).  The parties stipulated at trial that EJGH's total monthly rental obligation under the Lease is $43,499.82, comprising of $35,415.62 in base rent and $8,084.20 in CAM charges.  *See* ECF Doc. 154, ¶ 3; *see also* Lease, §§ 3–4.  The parties also stipulated that EJGH has always made timely monthly rental payments in the amount of $43,499.82 up to the date of trial, resulting in the total payment of $1,952,929.58 in rent to Cella. *See* ECF Doc. 154, ¶¶ 4–5.

Although the parties' intention vis-à-vis the Lease is for EJGH to build and operate a "community medical center" on the Leased Premises, the parties included no time limits under which EJGH would be obligated to obtain the regulatory approvals required to do so.  The plain, unambiguous terms of the Lease indicate that the parties contemplated that the required regulatory approvals may never arrive, *see* Lease, §§ 3 &28, leaving EJGH with only the obligation to pay rent, which it has done.[8]

---

[8]     Time still exists under the Lease for EGJH, or now its successor, LCMC Health, *see supra* note 4, to develop the Leased Premises.  The Lease states that the Leased Premises and any improvements made to the Leased Premises not affixed to the realty will become Cella's property at the end of the term of the Lease without any further compensation to EJGH.  *See* Lease, § 7(A)(4).  Although the Court finds that no breach of the Lease has occurred by EJGH as of the date of trial, the Court makes no ruling at this time regarding whether a breach could occur and damages could accrue before or at the end of the term of the Lease.  *See, e.g.*, *BRS Leasing & Fin., LLC v. Neff Rental, Inc.*, No. 03-3343, 2005 WL 32788, at *2–4 (E.D. La. Jan. 4, 2005) (summarizing the Louisiana Supreme Court's holding in *Bloom v. Southern Amusement Co.*, 81 So.2d 763 (La. 1955) and finding that when a lease is not terminated, "a lessor's right

### E.   EJGH Has Not Breached the Lease by Failing To Obtain and Maintain Insurance as Required Under the Lease

Cella also claims that EJGH breached the Lease by failing to obtain and maintain proof of insurance on the Leased Premises as required under the Lease.  *See* Petition, at 13; Hr'g Tr. 37:22–24 (Sept. 18, 2020).  Section 13 of the Lease requires EJGH to "obtain [and] maintain in full force and effect at all times during the term" its own commercial general liability and property damage insurance, worker's compensation insurance, flood hazard insurance, and business interruption insurance at all times during the term of the Lease, as well as obtain and maintain a builders risk insurance policy "to cover the entire value of improvements made by Lessee while work is underway."  Lease, § 13.  The Lease required that Cella be listed as an additional insured on all policies, with the exception of the worker's compensation insurance policy.  *Id*.

Ellen Marallo, EJGH's Risk Manager and Compliance Analyst, testified that she is the person responsible for "anything that has to do with insurance, anything that has to do with any claims or exposures for the hospital as well as licensures."  Hr'g Tr. 374:20–22 (Sept. 21, 2020).  Her credible and unrefuted testimony and documentary evidence regarding insurance coverage under the Lease showed that EJGH maintained all required insurance coverage during the term of the Lease, maintained builders risk insurance up to the date that development of the Leased Premises was interrupted on January 2, 2018 (satisfying the Lease's requirement for such coverage "while work is underway"), and listed Cella as an additional insured where required.  *See* Hr'g Tr. 374:23–414:21 (Sept. 21, 2020); Joint Exs. 5–7 & Ex. J.[9]

---

to damages in the event the lessee fails to make repairs does not accrue until the property is restored to the owner at the expiration of the lease").

[9]      Clarence "Bub" Millet, Senior Director of Facility Management for EJGH, testified that he instructed the contractor performing work to develop the Leased Premises to let the builder's risk insurance

Based on the evidence presented, the Court finds that EJGH satisfied the terms of the Lease by obtaining and maintaining the required insurance protections and designating Cella as an additional insured where required.

## CONCLUSION

For the foregoing reasons, this Court finds that Cella has failed to meet its burden to show that EJGH has breached the Lease and, therefore, Cella is not entitled to damages on any of the claims alleged in its Petition. The Court thus dismisses the Petition in its entirety.

A judgment based upon this ruling will be entered separately as required by Rule 58 of the Federal Rules of Civil Procedure and Rule 9021 of the Federal Rules of Bankruptcy Procedure.

New Orleans, Louisiana, December 29, 2020.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

policy lapse as of January 2, 2018, because he had received instruction that EJGH's development of the Leased Premises would be "holding for now." Hr'g Tr. 281:15–21; 289:8–15 & Ex. 28.